SHEARSON LEHMAN BROS. HOLDINGS, INC., Respondent, v MICHAEL SCHMERTZLER et al., Appellants.

First Department, April 3, 1986

## APPEARANCES OF COUNSEL

*Louis A. Craco* of counsel *(Lawrence O. Kamin* and *Jonathan P. Wolfert* with him on the brief; *Willkie Farr & Gallagher,* attorneys), for respondent.

*Arthur L. Liman* of counsel *(Steven B. Rosenfeld, Jeh C. Johnson* and *Bruce M. Handler* with him on the brief; *Paul, Weiss, Rifkind, Wharton & Garrison,* attorneys), for Michael Schmertzler, appellant.

*Henry L. King* of counsel *(James W. B. Benkard, Rodman W. Benedict* and *Barbara Botein* with him on the brief; *Davis Polk & Wardwell,* attorneys), for Morgan Stanley & Co. Incorporated, appellant.

## OPINION OF THE COURT

SANDLER, J.

This is an appeal by the defendants, Michael Schmertzler and Morgan Stanley & Co. Incorporated, from Special Term's October 8, 1985 order granting the motion of the plaintiff, Shearson Lehman Brothers Holdings, Inc. (Shearson), for a

preliminary injunction prohibiting Schmertzler from performing investment banking services for Morgan Stanley in the New York City metropolitan area, upon a finding that the performance of such services by Schmertzler would violate terms of a noncompetition agreement that he signed in connection with the acquisition by Shearson of all of the stock of Lehman Brothers Kuhn Loeb Holding Co., Inc. (Lehman Brothers), including the stock Schmertzler owned as a shareholder-employee of Lehman Brothers.

In our opinion, plaintiff failed to sustain its burden of satisfying any of the three familiar requirements for the issuance of a preliminary injunction, which are to clearly demonstrate: (1) likelihood of success on the merits, (2) irreparable injury in the absence of a preliminary injunction, and (3) a balancing of the equities in favor of the party seeking an injunction. *(See, e.g., Faberge Intl. v Di Pino,* 109 AD2d 235, 240.)

Whether Shearson sustained its burden of clearly demonstrating the likelihood of ultimate success on the merits presents a close and complex question which, for reasons that will be developed later, we believe should have been resolved in favor of defendants. The questions presented with regard to the two remaining elements do not seem as close.

There is simply no evidence in this record that without a preliminary injunction Shearson will be irreparably injured if Schmertzler, who had not engaged in investment banking services in the New York metropolitan area for more than two and one-half years before his employment by Morgan Stanley, is permitted to perform such services on behalf of one of the many financial concerns in this city whose activities embrace investment banking. Indeed, the record discloses no persuasive evidence that Schmertzler's performance of investment banking services in the metropolitan area would impair in any way the good will Shearson acquired when it purchased the stock of Lehman Brothers. Upon analysis, Special Term's conclusion is seen to rest primarily upon speculation that if a preliminary injunction were not granted, there might result an exodus from Shearson of others who had signed the non-competition agreement, a speculation unsupported by even a shred of evidence pointing to any other employee in a situation comparable to that of Schmertzler.

Moreover, upon consideration of all of the relevant circumstances, it is apparent that the equities tip strongly in favor of

the defendants. What unmistakably appears from the record is that Schmertzler has been enjoined from investment banking activities in the metropolitan New York City area although it is clear that the parties to the agreement did not then intend any such result. This conclusion is underlined by an aspect of the transaction that appears to have been overlooked by Special Term in its otherwise comprehensive opinion.

Schmertzler was one of a small group of managing directors of Lehman Brothers (in effect partners) with a minimum stock allotment who were asked to sign a noncompetition agreement. The record is persuasive that this group, a small minority of those directors who held minimum stock ownership, were asked to sign because of the nature of their assignments at Lehman Brothers at the time of the acquisition, none of them being then involved in investment banking, and not because of responsibilities that they had previously discharged. No managing director with comparable stock ownership in Lehman Brothers' Investment Banking Department at the time of the acquisition was asked to sign the noncompetition agreement, although it is indisputable that each of them was then far more significantly identified with Lehman Brothers' investment banking activities than any of those asked to sign, including Schmertzler. In short, a perplexing situation is presented in which Schmertzler has been enjoined from investment banking activities in the New York metropolitan area on the basis of an agreement he was asked to sign for reasons unrelated to investment banking, while those managing directors with comparable stock ownership actively engaged in investment banking at the time of the acquisition, all of whom received the same consideration for their stock as Schmertzler, remained free, individually or collectively, to leave Shearson and actively compete with it in the investment banking business.

On or about April 17, 1984, Shearson and Lehman Brothers entered into an agreement pursuant to which Shearson was to acquire Lehman's business for $317 million. The acquisition was effected through three interrelated agreements with the managing directors of Lehman Brothers—shareholder-employees who collectively owned all of the stock. First, the parties entered into a "Stock Purchase Agreement" whereby Shearson acquired the stock of Lehman Brothers that had been outstanding for over one year. Second, by a "Stock Option Agreement" Shearson acquired an option to purchase those

shares which had been outstanding for less than a year. (The option arrangement was adopted at the request of stockholders who wished to secure capital gain treatment on the sale of this stock.) Finally, a majority of stockholders (according to an affidavit submitted on behalf of Shearson, some 57 out of 92 stockholders) were asked to sign, and did sign, noncompetition agreements. Schmertzler, one of the managing directors who signed the agreement, owned 500 shares, or 0.49%, of the outstanding common stock, that amount being the minimum share allocated to Lehman managing directors.

In this action by Shearson seeking, *inter alia,* to enjoin Schmertzler's employment with Morgan Stanley & Co., Incorporated, as violative of the terms of the noncompetition agreement, the principal issue raised concerned the construction, reasonableness and legality of section 1 (c) of the noncompetition agreement. That section reads as here pertinent:

"1. Covenant Not to Compete. For a period commencing upon the consummation of the transactions contemplated by the Agreement for Purchase of Stock and ending on the third anniversary of the Closing Date, the Certain Stockholder will not, directly or indirectly, as a sole proprietor, member of a partnership, or stockholder, investor, officer or director of a corporation, or as an employee, agent, associate or consultant of any person, firm or corporation other than Lehman Brothers Kuhn Loeb Holding Co., Inc., or a successor corporation ('LBKL Holding') or one of its Subsidiaries * * *

"(c) Engage in any business within a 90 mile radius of the metropolitan area in which the Certain Stockholder conducted substantial business for the twelve month period preceding the Closing Date which is in substantial competition with any substantial business conducted in such area, at the time such engagement is commenced, by LBKL Holding or its Subsidiaries and in respect of which the Certain Stockholder had substantial responsibilities during the term of his employment by LBKL Holding and its Subsidiaries ('Prohibited Activity')".

The essential facts relating to Schmertzler's employment with Lehman Brothers and his responsibilities subsequent to the acquisition appear to be undisputed, although understandably the opposing affidavits stress different aspects of his services.

Schmertzler joined Lehman Brothers on or about September 1, 1977 as an investment banking associate in Lehman Brothers' New York office. He was quickly evaluated as an associate

of exceptional promise and over the years was given increasingly important responsibilities and received substantial increases in compensation as he progressed rapidly through the firm. In April 1981, Schmertzler was designated by the head of Lehman Brothers' International Investment Banking Department as his "top assistant", the department consisting additionally of 5 managing directors and some 10 associates. In that capacity he participated with the head of the department in the over-all planning and strategy of the department, supervised the work of the associates, and participated significantly in a number of important transactions. However, Schmertzler, as an associate, could not, as a matter of company policy, undertake certain responsibilities which were reserved to managing directors. These responsibilities included such matters as accepting representation of clients, negotiating fee arrangements, committing Lehman's capital to support underwritings, signing opinions, and formulating final recommendations to clients.

In December 1982, Schmertzler was asked to forego his corporate finance activities to become an administrator of the firm, first as chief financial officer, and then, still as an associate, as chief administrative officer. In these positions, Schmertzler was supervised by two of the most senior Lehman officers. Defendants assert without contradiction that he was instructed not to engage in investment banking business for the firm, and there is no persuasive evidence that he in fact did so during the period commencing in January 1983 and extending until after the acquisition of Lehman Brothers by Shearson in April 1984.

In September 1983, Schmertzler was elected a managing director and was invited to purchase 500 shares of Lehman stock, the minimum allotment to all new managing directors, which represented less than one half of 1% of Lehman stock at the time of the acquisition.

In July 1984, after the acquisition, Schmertzler was appointed head of Shearson's International Investment Banking Department and relocated to London to discharge those responsibilities. For reasons not relevant to the issues in this case, Schmertzler decided to seek other employment, and entered into discussions with Morgan Stanley in April 1985. On May 7, 1985, Schmertzler accepted an offer of employment in the area of investment banking with Morgan Stanley, resigning from Shearson effective May 11, 1985. During May 1985, and before Schmertzler started to work for Morgan

Stanley, the principals of that company negotiated with Shearson in an effort to reach an agreement defining the responsibilities Schmertzler might discharge with Morgan Stanley that would not be considered by Shearson as a violation of the noncompetition agreement. These negotiations having failed, Shearson commenced this lawsuit against Schmertzler for breach of the noncompetition agreement, and against Morgan Stanley for tortious interference with that agreement, simultaneously moving for a preliminary injunction.

In granting the injunction, which broadly prohibited Schmertzler from performing investment banking duties for Morgan Stanley within a 90-mile radius of the World Trade Center, Special Term concluded that the noncompetition agreement was valid and enforceable; that the term "substantial responsibilities" in the noncompetition agreement was clear and unambiguous, therefore excluding consideration of parol evidence; that Schmertzler had discharged such responsibilities both before and after the acquisition; and that Shearson had sustained its burden of establishing the above-described elements required for a preliminary injunction. We disagree with essential aspects of Special Term's findings, and accordingly would reverse the order appealed from to deny the motion for a preliminary injunction.

Analysis of the issues presented appropriately starts with a restatement of the governing rules of law that have been developed with regard to the legality and enforceability of noncompetition agreements. In what continues to be an authoritative exposition of those principles, the Court of Appeals in *Purchasing Assoc. v Weitz* (13 NY2d 267) observed that a distinction had developed between the rules governing such covenants when incident to the sale of a business, and covenants given by employees that do not accompany such a sale. As developed in the opinion, covenants not to compete incident to the sale of a business are more liberally enforced "on the premise that a buyer of a business should be permitted to restrict his seller's freedom of trade so as to prevent the latter from recapturing and utilizing, by his competition, the good will of the very business which he transferred for value * * * This court has applied the 'sale of a business' rationale where an owner, partner or major stockholder of a commercial enterprise has sold his interest for an immediate consideration which was, in part, payment for the good will of the business" (*supra*, at p 271). As further set forth in the opinion, the sole

limitation on such a covenant is that the restraint must be reasonable, "that is, not more extensive, in terms of time and space, than is reasonably necessary to the buyer for the protection of his legitimate interest in the enjoyment of the asset bought" *(supra,* at pp 271-272).

In distinction to covenants incident to the sale of a business, the court pointed out that a covenant given by an employee that he will not compete with his employer has been regarded much more strictly because of the "powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood" (13 NY2d, at p 272). Such covenants are "enforced only to the extent necessary to prevent the employee's use or disclosure of his former employer's trade secrets, processes or formulae * * * or his solicitation of, or disclosure of any information concerning, the other's customers" *(supra,* p 272). In addition, however, if the employee's services are unique or extraordinary, the covenant may also be enforced by injunctive relief, if reasonable, even though the employment did not involve trade secrets or confidential customer lists.

Preliminarily, we do not accept defendants' threshold contention that section 1 (c) of the noncompetition agreement should be considered unenforceable as being in essence an employment agreement because of Schmertzler's minimal ownership interest. In advancing this contention, defendants rely on the passing comment by the Court of Appeals in *Purchasing Assoc. v Weitz (supra,* at p 271) with reference to the enforcement of noncompetition agreements where it is incident to a sale by "an owner, partner or major stockholder of a commercial enterprise", and the holding in that case under circumstances clearly different from those here presented, that the noncompetition agreement was essentially an employment contract in character although purporting to accompany sale of a business.

Although no case has been called to our attention in which a noncompetition agreement of the character presented has been enforced with regard to someone with so small an ownership interest as that of Schmertzler, and the single appellate decision involving comparable ownership found a noncompetition agreement unenforceable *(White v Fletcher/ Mayo/Assoc.,* 251 Ga 203, 303 SE2d 746), we are persuaded that this defense contention is ultimately untenable. Its adoption would place an unacceptable barrier in the path of sales of businesses in which ownership is widely diversified, and in

which, as here, good will is clearly a central concern in the acquisition.

On the other hand, there is a clear, realistic difference between the problem presented by the application of a non-competition agreement to someone with a minimal ownership interest, and its application in the more familiar situation to the principal of a company being sold, or one of several principals of the company being sold, where their identification with the company sold is so significant and pronounced that subsequent competition would inevitably impair the value of that which was bought. This difference may well, when accompanied by other relevant circumstances, justify a different approach in evaluating the reasonableness of the agreement and the appropriateness of injunctive relief.

Turning now to the construction of section 1 (c) of the noncompetition agreement, and in particular to the meaning of the phrase "substantial responsibilities", we disagree with Special Term's conclusion that this term is clear and unambiguous, that parol evidence bearing on its meaning therefore may not be considered, and that the services rendered as an investment banker by Schmertzler as an associate more than a year prior to Shearson's acquisition of Lehman Brothers were clearly "substantial responsibilities" within the meaning of section 1 (c). This determination is plausible only if, contrary to the established rules governing the construction of agreements, the words "substantial responsibilities" are separated from the context of the agreement in which they appear, and viewed in the abstract. When viewed realistically in the business context in which the agreement was signed, the conclusion seems to us compelling that the meaning of the term was at best, from plaintiff's viewpoint, ambiguous.

The noncompetition agreement was signed incident to the sale of stock, the ownership of which was widely diversified among the managing directors of Lehman Brothers. Although most of the managing directors of Lehman Brothers were asked to, and did, sign the noncompetition agreement, many were not asked to sign, including a substantial majority of those with the minimum stock ownership held by Schmertzler. The small minority of stockholders owning 500 shares who were asked to sign appear to have been selected because of some characteristic of the duties they were performing at the time of the acquisition, without the slightest intimation in this record that any study was undertaken by Shearson with regard to their prior services, including services performed as

associates. As already pointed out, not a single managing director with comparable stock ownership then in the Investment Banking Department of Lehman Brothers was asked to sign, although it is a realistic assumption that the duties they were then discharging were at least as important as those discharged by Schmertzler more than a year previously as an associate, and although they were far more significantly identified than Schmertzler with Lehman Brothers' investment banking activities at the time of the acquisition.

Considering these circumstances as a whole, it is a reasonable inference that the agreement omitted to state specifically that "substantial responsibilities" referred to services performed by managing directors only because this was the common assumption of the parties to the agreement. This interpretation is confirmed by the uncontradicted parol evidence presented to Special Term, which under the circumstances should have been considered, but was not. The principal negotiators for Lehman Brothers deposed that it was never contemplated that the words "substantial responsibilities" embraced services performed by associates. It is not without significance that the senior attorney in the law firm that represented the managing directors of Lehman Brothers at the time the agreement was negotiated, who, at the time of this litigation, had a disinterested position between the parties, was willing to submit an affidavit as to the intended meaning of the clause if permitted to do so by Shearson, and that Shearson withheld that permission.

A closer, more complicated question is presented with regard to the duties discharged by Schmertzler in London after the acquisition in his capacity as head of international investment banking for the successor firm. Undeniably these services constituted "substantial responsibilities" within the meaning of section 1 (c). The immediate question presented is whether the agreement applies to services rendered after the acquisition of Lehman Brothers, and if so, whether the agreement is enforceable with regard to such postacquisition activities.

Preliminarily, we believe that plaintiff is clearly correct in its contention that as a matter of construction the agreement extends the noncompetition commitment to postacquisition substantial responsibilities. This conclusion seems inescapable in light of the definition of "LBKL Holding" as including Lehman Brothers Kuhn Loeb Holding Co., Inc., or a successor

corporation. On the other hand, we think it doubtful that the parties in fact intended what the agreement plainly stated.

Whether or not it is appropriate even with regard to a weighing of equities as it relates to a preliminary injunction to consider indications that the parties did not mean what an agreement clearly says presents a troublesome question that is unnecessary to decide here. The circumstances which give rise to doubt that the parties intended the noncompetition agreement to apply to postacquisition responsibilities are independently relevant to a consideration of issues on this appeal.

What becomes apparent from a study of the clause is the controlling importance given to the date of acquisition. The three-year term of the agreement not to compete starts on that date, and the section prohibits a signer from engaging in any business within a 90-mile radius of the metropolitan area in which he conducted substantial business "for the 12-month period preceding the closing date". Construing the agreement in accordance with plaintiff's interpretation, and what we accept as its plain meaning, the inexplicable anomaly is presented that a signer who conducted business in one metropolitan area (when he worked for Lehman Brothers) during the year prior to the acquisition, and who was thereafter given substantial responsibilities in another metropolitan area (when he worked for Shearson), is prohibited from competing with Shearson in regard to such responsibilities in the area in which he did substantial business prior to the merger, and not in the area in which he was more currently discharging his duties for Shearson. This is, in fact, what occurred with respect to Schmertzler, whose duties as head of Shearson's International Banking Department were discharged in London, and who has been enjoined from performing investment banking services in the New York City metropolitan area. It is not easy to believe that the sophisticated parties to this agreement intended so apparently absurd a result, and one so doubtfully related to any appropriate interest of Shearson in preserving the good will it had acquired.

Construing the noncompetition agreement, in accordance with its literal meaning, to apply to postacquisition responsibilities, a serious question is presented as to whether that aspect of the agreement may be sustained as reasonably incident to Shearson's acquisition of Schmertzler's minimal stock in Lehman Brothers. The issue is a close one, there appearing to be no prior authority clearly addressing it in a relevant context, and it may well be prudent for its ultimate

resolution to await a fuller development of circumstances than is now before us. But on the face of it, the agreement as so applied seems to assume preponderantly the aspects of a separate employment agreement, and is not enforceable as such under the circumstances here presented.

The good will that Shearson acquired as part of its purchase of outstanding stock of Lehman Brothers was surely that which existed at the time of the acquisition. During the period that Schmertzler discharged his postacquisition duties in London he was an employee of Shearson, and no longer a stockholder. To enlarge the scope of Schmertzler's covenant not to compete on the basis of responsibilities that were assigned to him as an employee after the acquisition, seems to transform the character of the noncompetition agreement at least to some extent from one incident to the sale of a business to that of a separate employment agreement. Recognizing that the answer to the question is not free from doubt, the issue seems sufficiently substantial to preclude a finding that Shearson has demonstrated the likelihood of ultimate success on the merits.

In evaluating whether or not Shearson has satisfied the requirement of showing that it would sustain irreparable injury in the absence of a preliminary injunction, an issue already addressed briefly in this opinion, it is important to distinguish the situation here presented from the more familiar one in which a principal, or a few principals in a firm, sign noncompetition agreements incident to the sale of the business, and in which it is clear that the entry of any one of them into a competing business would impair the good will that had been acquired. The same inference might well have been appropriate here if we were presented with a competitive activity by one of Lehman Brothers' principal managing directors at the time of the acquisition. That conclusion does not seem to follow quite so readily with regard to a managing director with minimal stock ownership who, as the record strongly indicates, was asked to sign the noncompetition agreement only because of his contemporaneous role in the administration of Lehman Brothers, and wholly without regard to the area of activity that is the subject of this action.

As to Schmertzler's services as an associate more than one year prior to the acquisition, it seems free from doubt that those activities would not, without more, justify an inference that his employment as an investment banker with Morgan Stanley would seriously impair the good will embraced in Shearson's acquisition of Lehman Brothers. On this issue we

think it dispositive that no managing director in Lehman Brothers' Investment Banking Department with comparable ownership was asked to sign the noncompetition agreement. In the absence of anything in this record to the contrary, the inference is compelling that their services were at least as important, if not more so, than those rendered by Schmertzler as an associate, and that they were more significantly identified with the investment banking activities of Lehman Brothers in the New York metropolitan area at the time of the acquisition than he was. The failure to ask any of them to sign the noncompetition agreement seems conclusive that Shearson did not believe that there would be an impairment of the good will that was acquired if those directors individually or collectively accepted employment as investment bankers with competing financial concerns. The same conclusion would seem to follow a fortiori with regard to investment banking services performed by Schmertzler as an associate some time before the acquisition.

Undoubtedly a closer question is presented by Schmertzler's postacquisition services as head of Shearson's International Banking Department in London. It is at least possible that in the course of those duties he became so identified with Shearson's investment banking activities that upon his accepting employment in the New York City metropolitan area, investment banking business would come to him in his new employment that might otherwise have gone to Shearson. Nothing in the record, however, provides any tangible support for this hypothesis, and against it must be weighed the central importance assigned in the noncompetition agreement to the geographical areas in which signing directors had conducted substantial business, and the doubtful, if not clearly unreasonable, character of an agreement that precludes a signer from working in one geographical area on the basis of responsibilities that he had assumed after the acquisition in another geographical area, although it does not restrain him from competing in the area in which he had in fact discharged those responsibilities.

In finding that Shearson had satisfied its burden of establishing irreparable damage if a preliminary injunction were not issued, it is apparent that Special Term was primarily influenced by a fear that a refusal to grant the motion for a preliminary injunction might somehow encourage an exodus to competing financial firms from Shearson of other Lehman Brothers managing directors who had signed. The record

discloses no support for this concern. What is immediately apparent is that Schmertzler's situation was an unusual one, quite possibly unique, among those who had signed the agreement, and it is far from clear, and certainly not established in this record, that any other signer occupied a position sufficiently comparable to that of Schmertzler to support Special Term's stated fear. More than unsupported speculation is required before a preliminary injunction can issue significantly constraining an individual's employment on the basis that irreparable damage would follow failure to grant such an injunction.

For reasons set forth at different points in this opinion, it seems clear that a balancing of the equities at this point of the litigation tip strongly in favor of the defendants. To capsulize what has already been said, Shearson has secured a preliminary injunction prohibiting Schmertzler from engaging in investment banking activities in the New York metropolitan area on the basis of his supposed violation of a noncompetition covenant which he was asked to sign because of services he rendered wholly unrelated to investment banking, which the parties did not contemplate at the time of the agreement would in fact curtail his right to engage in investment banking, and which was part of a transaction in which a majority of managing directors with Schmertzler's minimum stock interest, including all such directors then actively participating in investment banking, were not asked to sign. By any standard, the damage sustained by Schmertzler as a result of the preliminary injunction issued has been significantly greater than would have been sustained by Shearson if the preliminary injunction had not been granted, if indeed Shearson would have sustained any damage at all.

Accordingly, the order of the Supreme Court, New York County (Martin Evans, J.), entered October 8, 1985, which granted plaintiff's motion for a preliminary injunction prohibiting Schmertzler from rendering investment banking services in the New York City metropolitan area and prohibiting Morgan Stanley from employing Schmertzler to perform such services, should be reversed, on the law, on the facts, and in the exercise of discretion, to deny plaintiff's motion for a preliminary injunction.

Asch, J. (dissenting). At issue herein is the legality and scope of a noncompetition agreement between plaintiff and defendant Schmertzler, the former chief administrative and

chief financial officer of Lehman Brothers, who sold his stock in Lehman to plaintiff and thereafter resigned from Shearson Lehman in May 1985 and assumed employment with defendant Morgan Stanley the following month.

However, the precise question presented to us is whether Special Term exceeded its discretion in issuing a *preliminary injunction* enforcing the terms of a covenant not to compete executed in connection with the sale of a business.

Schmertzler is not exactly the seller of a small neighborhood grocery store who is prevented from making a living by a covenant not to compete. He is a sophisticated tycoon of American business who apparently has taken the substantial benefits of the very deal which he helped shape, the obligations of which he now seeks to repudiate.

Schmertzler joined Lehman Brothers as an entry level associate in 1977 upon his graduation from Harvard Business School. In January 1983, after being advanced to various positions as, *inter alia,* vice-president of the Investment Banking Division, he was promoted to the position of chief financial officer. Later that year he became, in addition, chief administrative officer. In September 1983, Schmertzler became a managing director—the equivalent of partner—and was invited to purchase 500 shares of stock in the firm.

At that time, Lehman Brothers Kuhn Loeb Incorporated was an independent corporation, the product of an earlier merger between the Lehman Brothers and Kuhn Loeb firms. This corporation was a wholly owned subsidiary of Lehman Brothers Kuhn Loeb Holding Co., Inc. The capital stock of Lehman was owned almost exclusively by the individual members of the board of managing directors. They controlled the distribution of shares for purchase by newly elected directors.

In April 1984, Lehman and Shearson agreed that Shearson, which itself had been acquired by American Express, would acquire the entirety of Lehman's business. In the first of three interrelated agreements (the stock purchase agreement), it was agreed that the American Express Co., Shearson's parent, would acquire the stock of Lehman Brothers which had been outstanding for over one year and transfer that stock to Shearson. Second, by a stock option agreement, American Express acquired an option to purchase the remaining shares of Lehman stock, i.e., the shares which had been outstanding for less than one year. This included Schmertzler's 500 shares, which represented .5% of Lehman stock. Upon the exercise of

the option, all of the stockholders subject to the stock option agreement were to be deemed subject to the stock purchase agreement. Third, certain managing directors were to sign, and did sign, noncompetition agreements for a three-year period from the closing date of the stock purchase agreements. Under the agreements, the Lehman director-shareholders were to become employees of the new entity. Each would receive a package of cash and notes commensurate with his holdings, as well as incremental payments over time from a bonus pool.

The noncompetition agreement, signed by certain managing directors including Schmertzler, provided that the certain stockholders would not engage in any business in substantial competition for a period of three years after the closing date of the stock purchase agreement.

On May 11, 1984, American Express acquired approximately 90% of all of the outstanding capital stock of Lehman in accordance with the stock purchase agreement, paying $280,037,512. On or about November 19, 1984, American Express and Shearson took delivery of the remaining stock of Lehman, including the 500 shares owned by Schmertzler, in accordance with the terms of the stock purchase agreement, paying $37,251,276.

Meanwhile, in July 1984, Schmertzler had become head of the new Shearson organization's International Investment Banking Department, and he thereafter moved to London. In about March 1985, Schmertzler expressed dissatisfaction with his position and contacted Morgan Stanley, who made him an offer to join the firm, which he accepted. He began working at Morgan Stanley on June 10, 1985.

Shearson thereafter commenced this action alleging Schmertzler's breach of the noncompetition agreement and breach of his fiduciary duty to Shearson, and Morgan Stanley's intentional interference with Shearson's contractual relations.

Shearson also moved for a preliminary injunction to enjoin Schmertzler from performing investment banking services for Morgan Stanley and to enjoin Morgan Stanley from employing Schmertzler as an investment banker within a 90-mile radius of New York City during the pendency of the action.

Special Term held that the noncompetition agreements were intended to be an integral part of the acquisition and that a noncompetition agreement in connection with the sale

of the business was permissible if necessary to protect the new owner and not unnecessarily burdensome to the promissor. The court noted Schmertzler's contention that the agreement should not be regarded as one in connection with the sale of a business, but simply as an employment contract. It held, however, that the situation contained elements of both the sale of a business and an ordinary employment contract. It was only because of the acquisition agreements that Schmertzler and his colleagues ceased being owners and became employees of the successor firm. Further, Special Term viewed the execution of noncompetition agreements by all key Lehman personnel as an important part of the entire acquisition plan and found that Shearson's purpose in the agreement was the preservation of the reputation, good will, operational effectiveness and expected potential of the business.

Special Term also held that the scope of the covenant was reasonable in terms of geographical area, time and subject matter.

With respect to the term "substantial responsibilities", the court rejected Schmertzler's limited definition and held that the absence of a definition did not create an ambiguity, but rather indicated that the parties intended that the term be given its ordinary meaning. Special Term further found nothing in the documents to lead to the conclusion that a special definition of "substantial responsibilities" was intended and refused to consider the affidavits submitted in opposition to the motion in order to change the unambiguous provisions of the covenant.

As to whether the noncompetition agreement prohibited Schmertzler from performing activities of a type he performed for the preacquisition entity or those activities performed for both the pre and postacquisition entities, the court concluded that it would make no sense to prohibit Schmertzler from performing for a competitor only such business as he might have performed prior to the acquisition.

The court also found that Schmertzler exercised substantial responsibilities, both before and after the acquisition, in both administration and investment banking. Upon those findings, the court concluded that Schmertzler's anticipated activity with Morgan Stanley would amount to a breach.

In granting the preliminary injunction, the court held that Shearson had no adequate remedy at law. The monetary damages would be difficult to calculate and the damage may

indeed be irreparable. The court foresaw the possibility of raiding by competitors of other covenanting Lehman personnel.

In deciding that the injunction similarly bind Morgan Stanley, the court stated that it would be ineffectual and inconsistent to enjoin Schmertzler from transferring to Morgan Stanley that which he had already sold to Shearson while not preventing Morgan Stanley from receiving the benefits wrongly transferred.

The order granting the preliminary injunction enjoined Schmertzler within a 90-mile radius of Two World Trade Center, New York City, from engaging in activities or services of the type over which he "had substantial responsibilities" during his employment by Shearson or Lehman, including investment banking services for or on behalf of any competitor of Shearson including Morgan Stanley.

I agree with these findings and conclusions of Special Term and, therefore, would affirm.

In order to establish its entitlement to a preliminary injunction, a plaintiff need only establish a likelihood of success on the merits, irreparable harm, and a balancing of the equities in its favor. *(Grant Co. v Srogi,* 52 NY2d 496, 517.)

A plaintiff need *not* demonstrate that it is certain to ultimately prevail, but simply a likelihood of success on the merits. *(Parkmed Co. v Pro-Life Counselling,* 91 AD2d 551, 553.) This standard was met by the plaintiff herein. *Purchasing Assoc. v Weitz* (13 NY2d 267) does not impose any more stringent standard for granting preliminary injunctions in cases concerning noncompetition covenants. The court, in *Weitz,* was reviewing the entry of a *permanent* injunction ordered after a full hearing on the merits.

In addition, the material facts underlying this litigation are not subject to material dispute.

Unlike the typical acquisition, in which the value acquired consists of tangible assets such as real estate and personal property, the only truly significant asset purchased by Shearson was Lehman Brothers' good will, i.e., the expertise of its personnel and the relationships they had developed with clients. It is mostly this good will for which the Lehman Brothers stockholders including Schmertzler received $317 million, and for which the noncompetition agreement was formulated.

Covenants not to compete, executed in connection with

transactions such as the merger herein, where good will is an element of the value conveyed, have been held to be enforceable as long as they are reasonably necessary to protect the good will being acquired and not unnecessarily oppressive to the promissor. *(See, e.g., Mohawk Maintenance Co. v Kessler,* 52 NY2d 276, 283-284; *Meteor Indus. v Metalloy Indus.,* 104 AD2d 440, 441; Note, *Economic and Critical Analyses of the Law of Covenants Not to Compete,* 72 Geo LJ 1425, 1426-1427 [1984].)

As found by Special Term, the essence of the transaction here was the purchase of Lehman Brothers' good will, the noncompetition agreement was necessary to protect that good will, and the agreement was not unnecessarily oppressive in its terms.

Simply because Schmertzler was not a controlling stockholder in Lehman Brothers does not mandate a finding that his noncompetition agreement was not ancillary to the sale of a business. Here, no single managing director of Lehman Brothers held a controlling number of the company's shares; indeed, no such stockholder held as much as 4.5% of Lehman Brothers stock and the vast majority owned no more than 2%.

It has been recognized that a minority stockholder-employee has a saleable interest in the good will of the corporation, which interest may be purchased and protected by a covenant not to compete. *(Berman v Reed, Roberts Assoc.,* NYLJ, Sept. 2, 1976, p 8, col 2 [Sup Ct, Nassau County], *affd* 58 AD2d 821 [25% stockholder]; *Lampert Agency v Barnett,* NYLJ, Oct. 12, 1972, p 17, col 6 [Sup Ct, NY County] [10% stockholder].)

*Purchasing Assoc. v Weitz (supra)* is not to the contrary. In *Weitz,* the Court of Appeals simply held that a noncompetition covenant could not be deemed ancillary to the sale of a business where the "business" allegedly conveyed had recently been created, had no good will, no customers, no going concern value, and did not engage in the activities prohibited by the covenant. None of this is true under the circumstances herein.

The finding by Special Term that the covenant not to compete was ancillary to the sale of the business was supported by the undisputed facts in the record. Schmertzler participated on a daily basis in the negotiation process. He examined virtually every document pertaining to the transaction. Similarly, Schmertzler was obviously a "rising star" at Lehman Brothers, which granted him more status and impor-

tance than his stock ownership would indicate. His decision to sign the noncompetition agreement in order to advance his career does not render it a product of coercion. His meteoric career underlines his sophistication and knowledge of the options he possessed at the time he sold his stock and agreed to sign the noncompetition agreement.

The covenant not to compete prohibited Schmertzler from engaging in any business, for a competitor of Shearson, for which he had "substantial responsibilities" during the course of his employment with either Lehman Brothers or with Shearson. Paragraph 1 of the noncompetition agreement provides in pertinent part:

"Covenant Not to Compete. For a period commencing upon the consummation of the transactions contemplated by the Agreement for Purchase of Stock and ending on the third anniversary of the Closing Date, the Certain Stockholder will not, directly or indirectly, as a sole proprietor, member of a partnership, or stockholder, investor, officer or director of a corporation, or as an employee, agent, associate or consultant of any person, firm or corporation other than *Lehman Brothers Kuhn Loeb Holding Co., Inc., or a successor corporation ('LBKL Holding')* or one of its Subsidiaries * * *

"(c) Engage in any business within a 90 mile radius of the metropolitan area in which the Certain Stockholder conducted substantial business for the twelve month period preceding the Closing Date which is in substantial competition with any substantial business conducted in such area, at the time such engagement is commenced, by LBKL Holding or its Subsidiaries and in respect of which the Certain Stockholder had substantial responsibilities during the term of *his employment by LBKL Holding and its Subsidiaries".* (Emphasis added.)

Defendants assert that there are ambiguities in the noncompetition agreement. They contend that the noncompetition agreement does not pertain to postacquisition activities. They concede that Schmertzler exercised substantial responsibilities in investment banking while at Lehman Brothers' successor, Shearson. While there, Schmertzler was in charge of Shearson's International Investment Banking Division, a position in which he earned over $500,000 a year. Defendants maintain, however, that those duties cannot be considered in determining the scope of the noncompetition agreement's prohibitions.

Defendants also assert that the term "substantial responsibilities" means only those duties dischargeable by a managing

director of Lehman Brothers and they would ignore entirely Schmertzler's responsibilities as an investment banking associate of Lehman Brothers. As second-in-command of Lehman Brothers' International Investment Banking Department, Schmertzler assigned and supervised the work of the other associates in the department, worked on over-all planning and strategy, served as liaison with other departments at Lehman Brothers, and discharged senior-management level responsibility on specific transactions, meeting with clients and third parties to negotiate terms of the transactions. As compensation for these responsibilities, Schmertzler earned $126,000 in 1981, $189,000 in 1982 and $341,357.80 in 1983.

In support of their contentions, the defendants offered parol evidence on both of these issues. The majority cites this parol evidence as supporting defendants' interpretation of "substantial responsibility". Parol evidence purporting to interpret the language of an integrated contract such as the noncompetition agreement is admissible if the contract is ambiguous. "The rule in this State is well settled that the construction of a plain and unambiguous contract is for the court to pass on, and that circumstances extrinsic to the agreement will not be considered when the intention of the parties can be gathered from the instrument itself." *(West, Weir & Bartel v Carter Paint Co.,* 25 NY2d 535, 540, *remittitur amended* 26 NY2d 969.)* The court must find, as a matter of law, that contractual language is ambiguous before considering extrinsic evidence. Even then, the evidence may not be used to vary or contradict the language of the contract, but only to interpret it so as to resolve the ambiguity. *(See, Sutton v East Riv. Sav. Bank,* 55 NY2d 550.) No such ambiguity exists in the noncompetition agreement.

Neither contention by defendants addresses the evidence submitted by Shearson that Schmertzler performed substantial investment banking services for Lehman Brothers *after* he was made a managing director of Lehman Brothers and *before* its acquisition by Shearson. The unrebutted evidence is that Schmertzler engaged during this period in client meetings regarding mergers and acquisitions and that he acted as an investment banker in connection with negotiating and structuring the Shearson acquisition of Lehman Brothers.

Moreover, the noncompetition agreement expressly defines the term "LBKL Holding" to include "Lehman Brothers Kuhn Loeb Holding Co., Inc. *or a successor corporation"* (emphasis added) and then goes on to restrict the persons entering into

the agreement, including Schmertzler, from performing for a competitor of LBKL Holding services for which he had substantial responsibilities during the term of his employment by LBKL Holding. Therefore, the restrictions set forth in section 1 (c) apply to services in competition with those performed for Lehman Brothers or its successor corporations. At the time the agreement was executed, the only successor corporation in the contemplation of the parties was Shearson.

Moreover, this definition of "LBKL Holding" to include successor corporations is used consistently throughout the agreement. Section 1 (a) of the noncompetition agreement prohibits parties to the agreement from soliciting business from, *inter alia,* any clients or prospective clients of LBKL Holding for anyone other than LBKL Holding or its subsidiaries. Section 1 (b) prohibits the soliciting of any employee of "LBKL Holding". If successor corporations are read out of the definition of "LBKL Holding", the agreement would only prohibit the solicitation of clients (and "prospective" clients) or employees of Lehman Brothers, which would not exist after the merger and would have neither clients nor employees. Similarly, the signers of the agreement would be entirely free to solicit Shearson customers and Shearson employees after the merger. This interpretation would give Shearson none of the protection for which it paid.

Defendants contend that the noncompetition agreement should not be treated as a covenant in connection with the sale of a business, since any activities which Schmertzler undertook for Shearson were as an employee and not a stockholder and, therefore, did not involve the good will Shearson purchased from Lehman Brothers' stockholders. This appears to be a gross exaggeration of the distinction between covenants not to compete in ordinary employment contracts and such covenants made in connection with the sale of the business.

The noncompetition agreement, by its terms, restricts the activities which Schmertzler could undertake in competition with those duties he performed for either Lehman Brothers *or* Shearson.

Defendants assert also that "substantial responsibilities" excludes all duties performed by associates. However, if the parties had intended to limit "substantial responsibilities" to those duties performed by a managing director, they could simply have said so. Special Term correctly observed that

nothing in the documents leads to the conclusion that a special definition of "substantial responsibilities" was intended, but rather that the parties intended that it be given ordinary meaning according to standard English usage.

Instead of identifying language in the noncompetition agreement to support their contention that the phrase "substantial responsibilities" should be given any meaning other than its ordinary one, defendants rely upon parol evidence which conclusorily asserts that the noncompetition agreement simply does not mean what it says, and that, in writing "substantial responsibilities", the parties really meant duties which could only be performed by a managing director. Any such reference to a supposed intent, unapparent in the agreement itself, is barred by the parol evidence rule. Under the guise of contract construction, a court may not create a wholly new contract. (*Goodstein Constr. Corp. v City of New York,* 111 AD2d 49, 52.)

The plaintiff established that it would suffer irreparable injury absent a grant of the preliminary injunction. The failure to require Schmertzler to abide by his promise might jeopardize the entire acquisition, since it is alleged that if Schmertzler's noncompetition agreement is not enforced, other covenanting Lehman Brothers personnel may be tempted to violate their obligation not to compete.

The injunction is proper, however, even absent the real threat that others will follow Schmertzler's example. As Special Term found, any monetary damage resulting from Schmertzler's breach and the loss of good will by plaintiff will be difficult, if not impossible, to calculate.

Furthermore, Schmertzler specifically agreed in section 3 of the noncompetition agreement that: "If there is a breach or threatened breach of the provisions of this Agreement, [Shearson] shall be entitled to an injunction restraining [Schmertzler] from such breach, if an injunction is permitted by applicable law. Nothing herein shall be construed as prohibiting [Shearson] from pursuing any other remedies for such breach or threatened breach."

The Court of Appeals has stated that if it appears that the performance of the covenant was intended by the parties, and not merely the payment of damages in case of a breach, the covenant not to compete will be enforced. (*Diamond Match Co. v Roeber,* 106 NY 473, 486.)

Defendants have suffered no unfair burden as a result of the

preliminary injunction. They simply have been required to delay the employment relationship which was commenced in clear violation of Shearson's rights. With respect to Morgan Stanley, the injunction presents no hardship since it is in the same position as it was before Schmertzler left Shearson. With respect to Schmertzler, he has accumulated considerable sums as a result of the purchase by Shearson of his ownership interest in Lehman Brothers. He also received substantial compensation as one of Lehman Brothers' and Shearson's employees. His decision to leave Shearson and work for Morgan Stanley was entirely his own. Indeed, the noncompetition agreement had an escape clause that specifically permitted Schmertzler to leave Shearson for "good reason". In such an event, Schmertzler would have been free of the constraints of the noncompetition agreement unless Shearson elected to keep them operable, in which case it would have been obliged to pay Schmertzler a yearly stipend of $225,000 through the remaining term of the agreement.

Unless he is enjoined, Schmertzler, as Special Term recognized, would be permitted to effectively sell his skills twice, first to Shearson, and second, to Morgan Stanley.

It has been brought to the attention of the court that, since the argument of this appeal, Mr. Schmertzler may have been promoted to partner in Morgan Stanley. If this has taken place, in spite of the restrictive covenant, Schmertzler does not appear to have been damaged by the injunctive relief. He may well be the Houdini of the American business system, apparently having successfully slipped out of what have been described by the press as the "golden handcuffs".

KUPFERMAN, J. P., SULLIVAN and KASSAL, JJ., concur with SANDLER, J.; ASCH, J., dissents in an opinion.

Order, Supreme Court, New York County, entered on October 8, 1985, reversed, on the law, on the facts, and in the exercise of discretion, to deny plaintiff's motion for a preliminary injunction.