**PRUDENTIAL SECURITIES, INC., Plaintiff,**

v.

**Michael J. PLUNKETT, Jr., Defendant.**

No. CIV. 2:98cv391.

United States District Court, E.D. Virginia, Norfolk Division.

May 26, 1998.

Robert Lee Harris, Jr., John R. Walk, Hirschler, Fleischer, Weinberg, Cox & Allen, Richmond, Miriam G. Baqhcall, Steven M. Malina, Brent A. Burns, Ungaretti & Harris, Chicago, IL, for Plaintiff.

Arlene F. Klinedinst, Vandeventer, Black LLP, Norfolk, VA, for Defendant.

## ORDER and OPINION

MORGAN, District Judge.

On April 22, 1998, the Court conducted a hearing on plaintiff's motion for a temporary restraining order / preliminary injunction. The Court offered to grant the motion to the extent that a joint letter be mailed by the parties to Plunkett's former Prudential clients detailing the limitations in Plunkett's employment contract and his move from Prudential to Dean Witter.

Prudential indicated to the Court that it would not seek this relief. *See* April 23, 1998 letter from Robert L. Harris, Jr. Accordingly, on April 24, 1998, the Court **DENIED** the motion for a temporary restraining order / preliminary injunction and **ORDERED** the case dismissed without prejudice. This opinion sets forth in more detail the reasoning for the Court's ruling.

## I. Factual and Procedural History [1]

On November 4, 1996, Michael J. Plunkett, Jr. accepted employment with Prudential Securities as a financial adviser in Prudential's

---

**1.** The Court's factual findings are for purposes of this motion only and do not constitute factual findings to be used in further proceedings in this case.

Charlottesville office. Prior to joining Prudential, Plunkett had never worked in the securities industry and was employed as a waiter at a Charlottesville restaurant. Prudential required Plunkett to sign a confidentiality agreement ("Financial Adviser in Training Agreement" or "FAIT Agreement") when he began work. It provided that if Plunkett left Prudential and joined a competitor in the securities industry, the FAIT Agreement prohibited Plunkett from soliciting his Prudential customers who were located within a 100 mile radius of Charlottesville for a period of six months. If Plunkett joined a competitor after leaving Prudential, the FAIT Agreement also prohibited Plunkett from using confidential information that he obtained while working at Prudential.

On February 24, 1998, Plunkett resigned from Prudential. On March 30, 1998, Plunkett began work for Dean Witter, a Prudential competitor, in its Virginia Beach office. When he left Prudential, Plunkett was servicing 60 accounts with an aggregate account value of $2,500,000. Many of these clients were Plunkett's friends or family members. In early April, approximately 20 of Plunkett's former Prudential clients transferred their accounts from Prudential to Dean Witter.

On April 14, 1998, Prudential filed a Complaint against Plunkett in this Court alleging breach of contract, breach of fiduciary duty, tortious interference with business relationships, misappropriation of confidential information and conversion. Prudential also requested a hearing before the Court on its motion for a temporary restraining order / preliminary injunction. Prudential filed a memorandum of law supporting that motion. Although Plunkett had not filed an Answer to the Complaint at the time of the hearing, Plunkett submitted a memorandum of law in opposition to the temporary restraining order on April 22, 1998.

### Standard of Review

 Because the FAIT Agreement specifies that it shall be interpreted under New York law, this Court must apply New York standards regarding temporary restraining orders, preliminary injunctions and arbitration. In order to prevail on a motion

for a preliminary injunction, a movant must demonstrate (1) a likelihood of ultimate success on the merits; (2) irreparable injury absent the granting of the preliminary injunction; and (3) a balancing of equities that favors the movant's position. *Merrill Lynch Realty Assoc., Inc. v. Burr*, 140 A.D.2d 589, 528 N.Y.S.2d 857, 860 (2d Dep't 1988). Irreparable harm is the "single most important prerequisite for the issuance of a preliminary injunction." *Frank Brunckhorst Co. v. G. Heileman Brewing Co., Inc.*, 875 F.Supp. 966, 974 (E.D.N.Y.1994) (citations omitted). "When the facts are sharply disputed, a preliminary injunction will not be granted." *Skaggs–Walsh, Inc. v. Chmiel*, 224 A.D.2d 680, 638 N.Y.S.2d 698, 699 (2d Dep't 1996).

Both the Second and Fourth Circuits have recognized that a district court has the authority to grant interim relief in an arbitrable dispute. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley*, 756 F.2d 1048, 1054 (4th Cir.1985); *Roso–Lino Beverage Distributors, Inc. v. Coca–Cola Bottling Co.*, 749 F.2d 124, 125 (2d Cir.1984). The purpose of a preliminary injunction or a temporary restraining order is to preserve the status quo. *McLaughlin, Piven, Vogel, Inc. v. W.J. Nolan & Co., Inc.*, 114 A.D.2d 165, 498 N.Y.S.2d 146, 151 (2d Dep't 1986). While a dispute may be subject to future arbitration, "[a]n injunction even a few days after solicitation has begun is unsatisfactory because the damage is done. The customers cannot be unsolicited. It may be impossible for the arbitral award to return the parties substantially to the status quo ante because the prevailing party's damages may be too speculative." *Bradley*, 756 F.2d at 1054.

New York courts have strictly construed restrictive covenants in employment contracts. Instructive is the assessment of restrictive covenants by the New York Court of Appeals in *Columbia Ribbon & Carbon Manufacturing Co., Inc. v. A–1–A Corp.*, 42 N.Y.2d 496, 398 N.Y.S.2d 1004, 1006, 369 N.E.2d 4 (1977):

> Since there are powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood ..., restrictive covenants which tend to prevent an employee from pursuing a similar voca-

tion after termination of employment are disfavored by the law .... Such covenants will be enforced only if reasonably limited temporally and geographically ... and then only to the extent necessary to protect the employer from unfair competition which stems from the employee's use or disclosure of trade secrets or confidential customer lists.

Other courts have noted that a restrictive covenant is also enforceable where the employee's services are unique or extraordinary. *See Shearson Lehman Bros., Inc. v. Schmertzler,* 116 A.D.2d 216, 500 N.Y.S.2d 512, 516 (1986).

### Analysis

In cases factually analogous to the case at hand, some courts have concluded that a temporary restraining order provided the plaintiff with a proper remedy. In *Bradley,* 756 F.2d at 1050, a securities firm sought to prevent a former executive from soliciting the firm's clients. In his employment contract, the employee had agreed not to solicit any former clients for a period of one year. *Id.* Although the parties had agreed to arbitration, the Fourth Circuit found that a preliminary injunction should issue because "the balance of hardship tip[ped] decidedly in Merrill Lynch's favor because Bradley did not establish that the preliminary injunction pending expedited arbitration would cause him harm and because Merrill Lynch faced irreparable, noncompensable harm in the loss of its customers." *Id.* at 1055. *See also Merrill Lynch, Pierce, Fenner & Smith v. Grall,* 836 F.Supp. 428 (W.D.Mich.1993) (granting a TRO where the broker in training, who had agreed in his employment contract not to solicit clients located within 100 miles of the former employer's office for a period of one year, admitted taking company documents and using those documents to solicit former customers); *Wells v. Merrill Lynch, Pierce, Fenner & Smith,* 919 F.Supp. 1047 (E.D.Ky.1994) (granting a TRO where senior brokers with substantial bargaining power solicited former clients in violation of

100 mile client restrictions in the brokers' employment contracts).[2]

On the other hand, a District Court in the Western District of New York recently concluded that issuance of a temporary restraining order in a case similar to the one before this Court was inappropriate. In *American Express Financial Advisord, Inc. v. Thorley,* 971 F.Supp. 780 (W.D.N.Y.1997), former sales agents of American Express were accused of violating restrictive covenants in their contracts. The Court held that "consideration of plaintiff's motion would be nothing but a waste of time and resources on the part of all concerned" because "American Express could seek precisely the same relief from an arbitrator that it seeks in this court, and that it could do so just as quickly in arbitration as here." *Id.* at 781. As in our case, "the NASD panel will be the ultimate arbiter of this dispute anyway, and to proceed in this court would run directly contrary to the policy favoring arbitration as a means to reduce the costliness and delays of litigation." *Id.* at 782. The Court also noted that "any harm that American Express might suffer during this time period would be compensable by money damages." *Id.*

With these principles in mind, this Court will analyze Prudential's claims under the applicable New York standards.

### (A). Likelihood of Success on the Merits

In analyzing whether Prudential would likely succeed on the merits, the Court must first construe the nature of the information sought to be protected. The information allegedly misappropriated by Plunkett, including customers' names, addresses, net worth, and telephone numbers, is not known outside of Prudential. Reconstruction of such information by Plunkett, from memory, would require him to exert considerable time and effort in researching telephone numbers and addresses, a factor supporting legal protection of the information.

**2.** While Prudential has submitted a number of orders from courts around the country enforcing Prudential's FAIT Agreement that is in issue in this case, the Court is unable to consider those

orders because the facts of those cases, including the circumstances behind the alleged solicitations and the relative bargaining power of the parties, were not provided to the Court.

Moreover, Prudential has made an effort to protect itself against disclosure of its customers and pertinent information related to their investment habits. Prudential requires brokers to sign a confidentiality agreement and limits broker access to customer information via a computer password. While certain facts may support Court-ordered protection of Prudential's customer list, there is authority that an employee who merely recalls customer information from memory has not violated his confidentiality agreement. *See Levine v. Bochner*, 132 A.D.2d 532, 517 N.Y.S.2d 270, 271 (2d Dep't 1987) ("It is well established that solicitation of an employer's customers by a former employee is not actionable unless the customer list could be considered a trade secret or there was wrongful conduct by the employee, such as physically taking or copying the employer's files or using confidential information."); *Zurich Depository Corp. v. Gilenson*, 121 A.D.2d 443, 445, 503 N.Y.S.2d 415 (2d Dep't 1986) ("The mere recollection of [protected] information as a result of casual memory is not actionable"). Given the limited facts presented to the Court, the Court will assume for purposes of this motion only that the customer lists are protectible.

Prudential next must show that Plunkett has contacted Prudential customers in violation of the FAIT Agreement. Mr. Pettibone, Prudential's branch manager in Charlottesville, testified that approximately twenty of Plunkett's former clients have transferred their accounts to Dean Witter since Plunkett obtained employment at Dean Witter. Prudential argues that the Court can infer that Plunkett solicited former clients and encouraged them to switch their accounts from the fact that Plunkett's former Prudential Charlottesville customers have transferred their accounts to Dean Witter. Moreover, Plunkett admits in his affidavit that he has contacted former clients.[3] However, Prudential concedes that mere contact, not rising to the level of solicitation, is not proscribed by the FAIT Agreement. Thus, in order to infer that Plunkett violated the 6 month, 100 mile restriction, the term "solicitation" must be defined.

The Court is concerned that the FAIT Agreement does not define the term "solicitation," although that term is crucial to its interpretation. While the plaintiff urges the Court to use the common dictionary meaning of "solicitation," the known facts contain many intricacies that require a more precise definition than the alternatives provided by the dictionary. The Court is concerned that a bright line cannot be drawn between what constitutes mere contact as opposed to solicitation.[4] For example, Plunkett may receive a call from a former client, perhaps a family member, to discuss personal issues. If Plunkett mentions that he has changed employment and the family member delves further, is Plunkett prohibited from further discussing the issue under the FAIT Agreement? Such questions would potentially require individual and repeated fact finding by the Court because of the use of the undefined term "solicitation." Because ambiguities in a contract must be construed against the drafter, *see Leninger v. Gibbs & Hill, Inc.*, 730 F.2d 903, 905 (2d Cir.1984), the Court FINDS that the term "solicitation" as used in the FAIT Agreement is ambiguous and its meaning must be construed against the drafter, Prudential.

Because the FAIT Agreement does not define the term "solicitation" and New York case authority strictly construes restrictive covenants in employment contracts, the Court does not find that Prudential is likely to succeed on the merits.

**(B).** *Likelihood of Irreparable Harm*

◾ Prudential argues that it will sustain irreparable harm if the temporary restraining order is not granted because it will sustain damage to its reputation and goodwill and will lose unspecified future commissions.

---

**3.** Unlike other reported cases finding irreparable harm to the securities firm, Prudential presented no evidence that Plunkett confiscated mailing lists, computer disks with confidential information on clients or any Prudential documents that could be used to Prudential's detriment.

**4.** The evidence indicates that approximately fifty percent (50%) of the net worth of Plunkett's accounts is based on a single account of his uncle.

Plunkett counters that Prudential could be adequately compensated by an award of damages, if Plunkett has in fact violated the FAIT Agreement.

The Court recognizes that a company spending a great deal of time and money cultivating clients may see its efforts destroyed when a former broker violates a restrictive covenant and solicits his former company's clients. At the hearing, however, Prudential's Charlottesville branch manager testified, under questioning from Prudential's counsel, that the only losses to Prudential resulting from Plunkett's move to Dean Witter were (1) the loss of commissions on accounts that switched to Dean Witter and (2) Prudential's expenses related to training Plunkett. Prudential presented no evidence that its reputation or goodwill would be harmed if Plunkett continued to contact former clients in an attempt to persuade them to transfer their accounts to Dean Witter. Both of those alleged losses can be quantified, and Prudential can be substantially compensated with monetary damages for those losses.

Unlike other reported cases finding irreparable harm to the securities firm, Prudential presented no evidence that Plunkett confiscated mailing lists, computer disks with confidential information on clients or any Prudential documents that could be used to Prudential's detriment. It appears to the Court that Plunkett merely used his memory to contact former customers. *See Levine,* 517 N.Y.S.2d at 271; *Zurich Depository,* 121 A.D.2d at 445, 503 N.Y.S.2d 415.

Because Prudential could be adequately compensated for its losses with damages, Prudential has failed to show that it will suffer irreparable harm if a preliminary injunction is not entered. Accordingly, this factor weighs in Plunkett's favor.

*(C). Balance of the Equities*

In considering the balance of the equities, the Court notes its concern that the contract is one of adhesion. Under New York law, restrictive covenants must be strictly construed against enforcement. *See Columbia Ribbon,* 398 N.Y.S.2d at 1006, 369 N.E.2d 4.

Plunkett was a new broker with little bargaining power when he signed the FAIT Agreement, while Prudential was a leading securities industries firm with hundreds of offices and thousands of agents. Given the inequality of bargaining power, Plunkett could not request that the 100 mile, 6 month no solicitation term of the contract be changed without risking denial of employment. While the FAIT Agreement's geographical limitation effectively limits Plunkett's sales within the remaining six month period to former clients who were based more than 100 miles from Charlottesville and to new clients that he may attract, Prudential, under the FAIT Agreement, is free to contact Plunkett's former clients and urge them to remain as Prudential customers. As the District Court stated in *Merrill, Lynch, Pierce, Fenner & Smith v. De Liniere,* 572 F.Supp. 246, 249 (N.D.Ga.1983), the granting of an injunction "would leave [the broker] with no client base in a business that thrives on commissions from regular clients.... Because the effect of the loss of income pending the outcome of this dispute would ... bear far more heavily on [the broker] than [the brokerage firm], that disparity of effect supports the denial of an injunction." [5]

The Court must also be mindful of the interest of Plunkett's former clients. Rule 412 of the Rules of the New York Stock Exchange provides that customers' accounts should be handled in such a way that coordination of activities between brokerage firms on a single account should not cause customers to endure losses as a result of firm competition. *See Siedman v. Merrill Lynch,*

---

**5.** In Plunkett's favor, the Court notes that Plunkett, unlike brokers in many other reported cases of a similar nature, had not surreptitiously accepted other employment when he resigned from Prudential. He alleges that he resigned from Prudential because his accounts were being passed to other brokers in the firm. He did not begin work for Dean Witter until over one month after he resigned from Prudential. Prudential denies the allegation that Plunkett's accounts were being redistributed, but does not dispute his assertion that he did not seek other employment prior to leaving Prudential.

*Pierce, Fenner & Smith, Inc.,* 465 F.Supp. 1233, 1236 (S.D.N.Y.1979). If the Court interpreted "solicitation" as proscribing communication between Plunkett and his former Prudential clients, the clients might be prejudiced. A broker-client relationship, like a lawyer-client or doctor-patient relationship, is a personal relationship dependent on personal trust. Clients should be free to deal with the broker of their choosing and not subjected to the turnover of their accounts to brokers associated with the firm but unfamiliar to the client, unless the client gives informed consent to the turnover. As the District Court in *De Liniere,* 572 F.Supp. at 249, noted, "[t]he public has a greater interest in being able to choose whether to follow its broker to a new firm or to remain at the old firm with a new broker.... The public has little interest in having its choice restricted to brokers other than the one that has served them..." (Citations omitted).

### CONCLUSION

In these days where the consolidation of financial institutions leads to significant layoffs, and employees show a similar lack of loyalty to employers, a standard letter of explanation to customers could be crafted as a part of a form of employment agreement. In this case, the Court offered to craft such a letter to Plunkett's customers. Prudential declined this relief, thereby calling into question whether it favored an objective disclosure to Plunkett's customers. Because plaintiff has failed to meet its burdens for obtaining a temporary injunction, the Court **DENIES** the temporary restraining order in the form the plaintiff has requested. As the parties agree that arbitration is mandatory, the case is **DISMISSED** without prejudice to the rights of either party in arbitration and in award enforcement.

The Clerk is **REQUESTED** to mail a copy of this Order to all counsel of record.

It is so **ORDERED.**