UBS PAINEWEBBER, INC., Plaintiff,

v.

Roger H. AIKEN; Michael S. Boulos;
and Patrick G. McQuilling,
Defendants.

No. CIV. 1:02CV56.

United States District Court,
W.D. North Carolina,
Asheville Division.

March 15, 2002.

438

Cynthia V. McNeely, Poyner & Spruill, Charlotte, NC, Lee H. Zell, Will Hill Tankersley, Kimberly Till Powell, Balch & Bingham LLP, Birmingham, AL, for plaintiff.

Robert B. Long, Jr., Philip S. Anderson, Long, Parker & Warren, P.A., Asheville, NC, J. Pat Sadler, Sadler & Hovdesven, P.C., Atlanta, GA, for defendants.

### MEMORANDUM AND ORDER

THORNBURG, District Judge.

**THIS MATTER** came before the Court for a hearing on Plaintiff's motion for a preliminary injunction pending arbitration. After entry of a temporary restraining order, the Court held a hearing on March 12, 2002, on the motion. Based on the preliminary findings and legal conclusion set forth below, the Court will grant Plaintiff's motion and enter a preliminary injunction against the Defendants.

### I. PROCEDURAL HISTORY

Plaintiff's complaint, filed March 5, 2002, seeks injunctive relief against the Defendants Roger H. Aiken (Aiken), Michael S. Boulos (Boulos), and Patrick G. McQuilling (McQuilling). On March 6, 2002, Plaintiff filed a motion for a temporary restraining order and preliminary injunction pursuant to Fed.R.Civ.P. 65 and Defendants responded on the same day. Based on these submissions, the Court entered an order granting the Plaintiff a temporary restraining order, although in a more limited form than requested. Based on the factual allegations set forth in the pleadings and the arguments of counsel during the hearing, and bearing in mind that the burden is on the Plaintiff to prove each of the requirements for a preliminary injunction, the Court makes the following findings of fact. *Manning v. Hunt*, 119 F.3d 254, 265 (4th Cir.1997) ("the burden is on the plaintiff to demonstrate that all the requirements of *Blackwelder* favor granting the preliminary injunction").

### II. FINDINGS OF FACT

Aiken, formerly a member of the stock brokerage firm of J.C. Bradford & Co.(Bradford), was employed as branch manager of its Asheville, North Carolina, office. In April 2000, PaineWebber[1] began implementation of its acquisition of Bradford. PaineWebber's obligation to complete the transaction was made contingent on the execution of a Personal Employment Agreement (PEA) by 90 percent of a select group of Bradford members which included Aiken. On May 22, 2000, Aiken executed his PEA with PaineWebber; and in consideration therefor, received consideration which the parties agree was in excess of $700,000.00. PaineWebber closed its acquisition of Bradford on June 9, 2000.

Among the terms of the PEA signed by Aiken and the other Bradford members as a part of the buyout were the limitations at issue in this case. The PEA contains a choice of law clause stating that New York law will govern the contract. Aiken's PEA was to run for a term of four years. At the close of the four-year term, Aiken's employment with PaineWebber would be-

---

1. For convenience, Plaintiff and its predecessors in interest and affiliated corporations are referred to collectively throughout as "PaineWebber."

come "at will" and the restrictions of the PEA would no longer apply to him. During the four-year term, however, Aiken could only be terminated for cause as set forth in the agreement. Nonetheless, if Aiken's employment at PaineWebber ended, regardless of the reason, he was subject to the following restrictions for one year, *i.e.*, "the Non–Compete Period:" (1) Aiken would not engage "in any of the duties" he had performed at PaineWebber for any other employer, including himself; (2) he would not "induce or attempt to persuade" an employee of PaineWebber to discontinue employment with that firm; and (3) for six months following the termination of his employment, Aiken would not solicit "brokerage business" from customers of PaineWebber or provide such business to them. *See,* Exhibit A, Personal Employment Agreement, *attached to* Plaintiff's Complaint.

In addition to the "Non–Compete Period" restrictions, Aiken also agreed not to copy, use or disclose "Confidential Information" received in the course of his employment at PaineWebber. The definition of "Confidential Information" in the PEA included any information about PaineWebber or any of its clients or employees that Aiken obtained as a result of his employment with that company.

Unlike Aiken, Boulos and McQuilling were not subject to the PEA restrictions. However, certain employment restrictions were contained in Employee Forgivable Loan (EFL) agreements which each of them signed as part of their compensation

package with PaineWebber.[2] Under the EFL terms, both Boulos and McQuilling agreed not to solicit any PaineWebber customers whom either of them serviced. They also agreed to return any and all records relating to clients of PaineWebber. The EFL declares that these restrictions apply to each of them, "until such time as this [EFL] has been forgiven by [Paine-Webber] in full ..., or repaid by [Boulos or McQuilling] to [PaineWebber] in full ...." The parties agree each of the Defendants repaid the unforgiven portions of his respective EFL in full at the time of his resignation.

On March 1, 2002, Aiken, Boulos, and McQuilling resigned from PaineWebber and subsequently were employed by A.G. Edwards & Sons, Inc. (Edwards). It is undisputed that each of them has sent letters to clients of PaineWebber. Boulos and McQuilling admit their letters solicited these clients to transfer their accounts to Edwards. Aiken argues that his letters did not actually solicit clients to transfer their accounts but merely detailed the restrictions placed on Aiken by the PEA and informed the clients of their right to place their account with whatever firm they might choose. The letter contained the following: "If you wish to continue our business relationship, please sign the enclosed transfer form(s) and return the form(s) along with a copy of your most recent account statement to us in the enclosed, self-addressed envelope.[3]" Included were the forms required to transfer the accounts. Aiken argues that because the

2. The EFL agreement was a lump sum payment to the employee who had no obligation to repay it as long as he remained in PaineWebber's employ.

3. There is evidence to indicate that the suspicious activities engaged in by the Defendants leading up to their departure included sending clients copies of these account statements.

Defendants claim that these copies were sent to aid the clients in preparing their taxes, however, copies of these account statements are sent directly from PaineWebber's home office to clients in anticipation of annual tax reporting. It is reasonable to infer that the Defendants sent these clients this information to aid in the transfer of accounts.

PEA does not define "solicit" the term must be construed against PaineWebber as the drafter of the document.

This argument about the definition of solicitation puts the Court in mind of Justice Stewart's oft quoted statement regarding hard-core pornography, "I shall not today attempt further to define the kinds of material I understand to be embraced within that shorthand description; and perhaps I could never succeed in intelligibly doing so. But I know it when I see it." *Jacobellis v. Ohio*, 378 U.S. 184, 197, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964). The language in Aiken's letter solicits clients to transfer their accounts to Edwards.

The evidence also shows that Defendants took documents, including client lists of the Asheville branch of PaineWebber, for use at Edwards. In response to the temporary restraining order, Defendants returned a number of documents to Paine-Webber, despite their sworn statements in declarations that such documents had not been taken. Additional information, stored as documents or on computers, has been destroyed, deleted, or otherwise removed from the control of PaineWebber.

Furthermore, the submissions of Paine-Webber create a strong impression that Aiken persuaded Boulos and McQuilling to join him in leaving PaineWebber. The Defendants also appear to have encouraged others to consider a move to Edwards although to this point, no others are alleged to have left PaineWebber's employ.

Defendant Aiken's conduct is admittedly in violation of the terms of the PEA and the Court finds he has deliberately and irresponsibly breached a contract into which he knowingly and voluntarily entered in return for substantial remuneration.

## III. PRELIMINARY INJUNCTION

### A. Standard

In order to establish the right to a preliminary injunction, PaineWebber must establish by a preponderance of the evidence:

(1) The likelihood of irreparable harm to the Plaintiff if the preliminary injunction is denied;

(2) the likelihood of harm to the Defendants if the requested relief is granted;

(3) the likelihood that the Plaintiff will succeed on the merits; and

(4) the public interest

The stronger PaineWebber's showing of success on the merits, the less it must show regarding the relative harm of the relief sought in order to prevail. Likewise, the greater the possible harm, the less likelihood of success on the merits PaineWebber must demonstrate. *See, e.g. Arkansas Best Corp. v. Carolina Freight*, 60 F.Supp.2d 513, 515 (W.D.N.C.1999); *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir.1991); *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189 (4th Cir.1977). The law in this Circuit is clear that the "balance of the harms" aspect of this test is more important than the "likelihood of success on the merits." *See, Safety–Kleen, Inc. v. Wyche*, 274 F.3d 846, 868 (4th Cir.2001) (Luttig, J. dissenting) (noting that under the *Blackwelder* standard, "[t]he two more important factors are those of probable irreparable injury to the plaintiff without a decree and of likely harm to the defendant with a decree." (quoting *Blackwelder*, 550 F.2d at 196)). The "balance of the harms" test is to be performed before any analysis of the "likelihood of success on the merits." *Id.* ("[T]he first step in a Rule 65(a) situation is for the court to balance the 'likelihood' of harm to the plaintiff against the 'likelihood' of harm to the defendant."

(quoting *Blackwelder*, 550 F.2d at 195)). If the "balance of the hardships" favors PaineWebber, " 'it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them fair ground for litigation.' " *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir.2001) (quoting *Blackwelder*, 550 F.2d at 195).

## B. Entry of Preliminary Injunction Pending Arbitration

The parties agree that all of the issues involved in this litigation are subject to arbitration. Under the terms of the PEA, however, PaineWebber reserved the right to seek preliminary injunctive relief from a court of competent jurisdiction.[4] District courts have jurisdiction to enter preliminary injunctive relief despite the fact that the case is subject to binding arbitration. 9 U.S.C § 1, *et seq.*; *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley*, 756 F.2d 1048, 1053–54 (4th Cir.1985).

## IV. ANALYSIS

### A. Risk of Irreparable Harm to Paine-Webber

■ PaineWebber claims that the possibility Aiken will continue to solicit clients from PaineWebber creates the risk of irreparable harm.[5] "When the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied." *R.J. Reynolds Tobacco Co. v. Philip Morris, Inc.*, 60 F.Supp.2d 502, 509 (M.D.N.C.1999)

(citing *Multi–Channel T.V. Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 552 (4th Cir.1994)); *see also, Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley, supra* (the possibility of permanent loss of customers to a competitor or possible loss of good will satisfies the irreparable harm prong of the *Blackwelder* standard in a case where a broker, subject to non-compete and non-solicitation clauses, changed brokerage firms.). PaineWebber also argues that allowing Aiken to provide solicited clients with brokerage services, in violation of the non-compete clause of the PEA, creates the likelihood of irreparable harm.

Defendants counter that PaineWebber has not shown "irreparable" harm because any such damage could easily be reduced to a monetary award. *See, e.g., Morgan Stanley DW Inc., v. Frisby*, 163 F.Supp.2d 1371 (N.D.Ga.2001); *Prudential Sec., Inc. v. Plunkett*, 8 F.Supp.2d 514 (E.D.Va. 1998); *FMC Corp. v. Cyprus Foote Mineral Co.*, 899 F.Supp. 1477 (W.D.N.C.1995). *Frisby* is discounted because it involved Georgia law. However, in *Plunkett* the court found, under New York law, that the plaintiff had not shown a likelihood of irreparable harm primarily because he could renew his request to the arbitration panel. *Plunkett*, 8 F.Supp.2d at 517, 519 (relying on *American Express Financial Advisors, Inc. v. Thorley*, 971 F.Supp. 780 (W.D.N.Y. 1997)); *accord, Frisby, supra*. Here, the parties agree, and the PEA provides, that PaineWebber is entitled to seek preliminary injunctive relief from either the arbitration panel or this Court.

Moreover in *Plunkett*, the Court noted:

---

4. This Court's jurisdiction is proper under 28 U.S.C § 1332. All Defendants are residents in this judicial district. Plaintiff is a Delaware corporation with its principle place of business in New York. The amount in controversy in the underlying dispute is alleged to exceed $75,000 dollars.

5. It appears from the course of the hearing that no substantial threat remains that Paine-Webber employees will leave as a result of Defendant's inducements. Insofar as such a threat does remain, it would likewise create the risk of irreparable harm.

Unlike other reported cases finding irreparable harm to the securities firm, Prudential presented no evidence that Plunkett confiscated mailing lists, computer disks with confidential information on clients or any Prudential documents that could be used to Prudential's detriment. It appears to the Court that Plunkett merely used his memory to contact former customers.

*Id.,* at 519. The evidence here, however, is precisely that not shown in *Plunkett.*

PaineWebber also notes that the Defendants' continued possession of confidential information or trade secrets "obviously jeopardizes PaineWebber's ability to service existing customers and erodes and destroys customer's expectations that the private financial information be protected by PaineWebber." Plaintiff's Brief in support of Complaint, at 29. In response, Defendants rely on *Frisby,* but also cite *FMC Corp., supra.* The *Frisby* decision found that the information involved in *FMC Corp.* did not constitute a trade secret. *Frisby,* at 1378–79. Likewise, Defendants' reliance on *FMC Corp.* is inappropriate because that plaintiff was unlikely to succeed on the merits. *FMC Corp.,* 899 F.Supp. at 1483 ("For one thing, it is not clear that FMC will be harmed."). In *FMC Corp.,* the two firms involved were the only two in America that worked with a particular type of lithium product. *Id.* When one of plaintiff's employees moved to the defendant firm, the plaintiff alleged he took with him a process which the defendant previously had to pay plaintiff to perform. *Id.* Plaintiff feared the defendant would now be able to perform that process on its own. However, any damages resulting from such a change would be based on the fees the plaintiff had previously charged for that service. Thus, the court determined that calculating monetary damages would be relatively easy. *Id.*

Finding that certain information is or is not a trade secret (or at this stage, that the allegations support such a conclusion) is a matter for determination under the first prong of the *Blackwelder* test. The possible damages to PaineWebber resulting from the loss of these trade secrets is not readily calculable. *See, Bradley,* at 1054 ("It may be impossible for the arbitral award to return the parties substantially to the status quo ante because the prevailing party's damages may be too speculative"). Thus, if any information at issue here does constitute a trade secret, the failure of Defendants to return such information to PaineWebber is likely to cause them irreparable harm. *Id.*

■ In the temporary restraining order issued in this case, the undersigned did not restrict Aiken from competing with PaineWebber by working as a broker at Edwards. The Court is not entirely persuaded that the harm which PaineWebber suffers as a result of Aiken's competition is as likely to be "irreparable" as the harm which it suffers as a result of his continued solicitation of PaineWebber clients. Aiken has, however, essentially admitted that his conduct in working for Edwards is in direct violation of the non-compete provisions of the PEA (insofar as that non-compete provision is valid). The likelihood of success on the merits PaineWebber has demonstrated on this issue is quite high. As such, the Court will preliminarily enjoin Aiken from violating the non-compete provisions of the PEA as well.

**B. Risk of Harm to the Defendants**

■ The Defendants have submitted no evidence or argument that they are likely to suffer any significant harm should the Court grant this preliminary injunction. This is based, in part, on their unwillingness to disclose the terms of their new

employment agreements with Edwards. Furthermore, Aiken received what Paine-Webber's attorney referred to as "a small fortune" in return for his interest in Bradford. He is hard pressed to say that, even if he is restricted from working pending final arbitration of this case, he is likely to suffer any hardship. The Defendants do cite several cases for the proposition that the potential harm to the broker outweighs the relative harm to the brokerage firm in this situation; however, those cases assume the harm to the brokerage firm is easily reducible to a monetary award. *See, Plunkett, supra; Merrill Lynch, Pierce, Fenner & Smith v. de Liniere,* 572 F.Supp. 246, 249 (N.D.Ga.1983).

PaineWebber has demonstrated the likelihood that it will suffer irreparable harm if an injunction is not granted pending arbitration. The Defendants fail to demonstrate the likelihood of harm to them if an injunction is granted. As such the "balancing of the harms" swings strongly in favor of PaineWebber. The showing which PaineWebber must make on the likelihood of success on the merits is merely that "plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them fair ground for litigation." *MicroStrategy, supra.*

**C. Likelihood of Success on the Merits**

▆▆▆ Defendants argue that no arbitration panel, ruling on the PaineWebber PEA at issue in this case, has ever entered a permanent injunction against a former PaineWebber broker. As such, Paine-Webber cannot show a likelihood of success on the merits of injunctive relief, regardless of the possibility of success on the merits as a whole. Therefore, Paine-Webber fails its burden on this prong of the test. However, the *proper inquiry is* the movant's likelihood of success on the

merits as a whole rather than one aspect of the his claim, such as permanent injunctive relief. *See, e.g. In re Richmond Paramedical Servs., Inc.,* 94 B.R. 881, 884 (Bkrtcy.E.D.Va.1988) (noting that it was the likelihood of successful reorganization, not the likelihood of success on a particular claim which controlled); *IDS Life Ins. Co. v. SunAmerica, Inc.,* 958 F.Supp. 1258, 1274 (N.D.Ill.1997), *aff'd in part, vacated on other grounds,* 136 F.3d 537 (7th Cir. 1998). Furthermore,

> a plaintiff need only show a likelihood of success on the merits ... in order to obtain a preliminary injunction—not success itself, which may be determined by a different fact finder.... It is entirely possible that a party may prove entitlement to a preliminary injunction, yet still lose the case on the merits.

*Linear Products, Inc. v. Marotech, Inc.,* 2002 WL 337416, *5 (W.D.Va.2002).

Defendants admit that Aiken is competing with PaineWebber in performing his duties at Edwards. Furthermore, they admit that all (or at least some) of them have taken documents and information from PaineWebber to Edwards. Insofar as they might deny that fact, the volume of information which was returned to Paine-Webber as a result of the temporary restraining order belies that contention. The Defendants raise three basic points as to why their conduct is not unlawful. First, Aiken argues that the non-compete and non-solicitations clauses of the PEA are not enforceable against him. Second, Boulos and McQuilling argue that any restriction in the EFL on their rights to compete and utilize confidential information was lifted before they took any such information. Third, Boulos and McQuilling argue that, insofar as the North Carolina Trade Secrets Act governs their behavior, the information they have taken

from PaineWebber is not protected by that Act.

### a. Enforcement of the Non–Compete and Non–Solicitation Clauses of the PEA

█ It is, at this point, axiomatic that federal courts, sitting in diversity jurisdiction, apply the choice of law rules of the forum state. *See, Silvestri v. General Motors Corp.,* 210 F.3d 240, 243 (4th Cir. 2000); *Klaxon v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In a recent opinion, the North Carolina Court of Appeals ruled on a question similar to that at hand. *Bueltel v. Lumber Mut. Ins. Co.,* 134 N.C.App. 626, 518 S.E.2d 205 (1999). As that court stated, "the interpretation of a contract is governed by the law of the place where the contract was made." *Id.,* at 631, 518 S.E.2d at 209 (citing *Tanglewood Land Co. v. Byrd,* 299 N.C. 260, 262, 261 S.E.2d 655, —— (1980)). The *Bueltel* Court went on to note, "[w]here parties to a contract have agreed that a given jurisdiction's substantive law shall govern the interpretation of the contract, such a contractual provision will be given effect." *Id.* (citing *Tanglewood*). That court's ruling on the choice of law provision is equally applicable to this case.

> Based on the foregoing, and following the logic of *Tanglewood Land Co.,* it is apparent that when a choice of law provision is included in a contract, the parties intend to make an exception to the presumptive rule that the contract is governed by the law of the place where it was made. The [PEA] states that the law of [New York] is to apply to its construction and enforcement [to the extent not preempted by ERISA]. Choice of law provisions are not contrary to the laws of this state. The parties' intent must rule and we therefore hold that [New York] law applies to the construc-

> tion and enforcement of the Agreement in all respects. [Aiken's] arguments that the Agreement is invalid under North Carolina law are therefore without merit.

*Id.* In opposition to this point, the Defendants point to *Cox v. Dine–A–Mate, Inc.,* 129 N.C.App. 773, 501 S.E.2d 353 (1998).

> What concerns this Court is that, in a case such as this one, application of New York law would be a violation of North Carolina public policy in that the contract before us falls squarely into the category of an attempt to prevent competition rather than to protect a legitimate interest of the employer.

*Id.,* at 778, 501 S.E.2d at 356. However, the *Bueltel* court makes no mention of this language in *Cox* and the statements in the *Bueltel* case were necessary to that Court's decision. The *Cox* court determined that the non-compete clause at issue there was void for want of valid consideration. *Id.* As such, this Court will follow the more recent holding of *Bueltel* over the *dicta* in *Cox.* In any event, given the impact of rulings of governing bodies such as the National Association of Securities Dealers on interstate commerce throughout this nation, it is necessary and desirable that uniformity in application of the rules be enforced. In this case, such uniformity is sought by reference to New York law.

### b. New York Law on the Enforcement of Covenant's not to Compete

█ PaineWebber argues, and the Defendants do not contest, that under the governing New York law the non-compete and non-solicitation clauses of the PEA, as applied to Aiken, are enforceable. Under New York law,

[covenants not to compete] will be enforced only if reasonably limited temporally and geographically and then only to the extent necessary to protect the employer from unfair competition which stems from the employee's use or disclosure of trade secrets or confidential customer lists.

*Columbia Ribbon & Carbon Mfg. Co. Inc. v. A–1–A Corp.,* 42 N.Y.2d 496, 499, 398 N.Y.S.2d 1004, 369 N.E.2d 4 (1977) (internal citations omitted). In the context of the sale of a business, however, these restrictions will be enforced more broadly in order to protect the goodwill of the business which the buyer has purchased. *Kraft Agency Inc. v. Delmonico,* 110 A.D.2d 177, 494 N.Y.S.2d 77, 80 (1985) (citing *Mohawk Maintenance Co. v. Kessler,* 52 N.Y.2d 276, 437 N.Y.S.2d 646, 419 N.E.2d 324 (1981), and *Purchasing Assoc., Inc. v. Weitz,* 13 N.Y.2d 267, 271–72, 246 N.Y.S.2d 600, 196 N.E.2d 245 (1963)). Aiken was a Bradford partner and part owner of the business. PaineWebber argues that it paid a premium for the ownership interest of the 90 percent of Bradford members identified in the agreement precisely so that they could purchase the goodwill these members had established with their respective clients.[6] In fact, the New York cases discussing this issue have defined goodwill as "right of the purchaser to expect that the firm's established customers will continue to patronize the business." *Id.* (citing *Mohawk Maintenance, supra*). Defendants do not contest this

point and the terms of the PEA make it clear that PaineWebber purchased the goodwill Bradford had built up through Aiken with the clients at issue. The Court concludes that the more lenient New York standards used in context of the sale of a business apply here.

#### c. Reasonableness as to Territory

 Aiken argues that the PEA is unreasonable as to its territorial scope. Essentially, the PEA prohibits Aiken from competing with PaineWebber anywhere that PaineWebber has an office or otherwise serves clients. Given the communications capabilities of the modern world, this provision would prevent Aiken from violating the terms of the PEA anywhere in the world. The Court will not attempt to determine whether this restriction is reasonable in light of the aforementioned communications capabilities.[7] New York courts will "blue pencil" the territorial terms of otherwise reasonable covenants not to compete. "Where an otherwise valid restrictive covenant does not contain a geographic limitation, the court may, if warranted by equity as it is in the present case, interpret the clause in conformity with the intent of the parties." *Giller v. Harcourt Brace & Co.,* 166 Misc.2d 599, 634 N.Y.S.2d 646, 648 (N.Y.Sup.Ct.1995) Without attempting to discern the full scope of the agreement at this stage, the Court determines that, at a minimum, it was intended to cover people or other legal entities who were Bradford clients ser-

---

6. Aiken now argues that because he held a relatively minor partnership interest in Bradford, he was essentially forced to accept the PaineWebber buyout and the PEA. He claims he would have been fired if he did not accept the deal. The Court has seen no evidence on this point, and it is best left for ultimate decision by the arbitrators, but the Court notes that Aiken can only be viewed as a sophisticated actor dealing in arms length transactions.

7. As is clear from the scope of the injunction, the proper inquiry in this type of case is not the geographic location at which Aiken provides his services, but the clients whose goodwill PaineWebber had purchased along with Bradford's business or whose goodwill Paine-Webber had accumulated through Aiken's efforts.

viced by Aiken at the time PaineWebber closed its deal purchasing Bradford. The agreement also covers any clients serviced by Aiken during the time he was employed by PaineWebber. Further restrictions on Aiken's ability to provide stock brokerage services are not warranted at this stage.

### 1. Application of the Restrictions in the EFL to Boulos and McQuilling

Boulos and McQuilling argue that the only restrictions placed on their ability to compete or to utilize customer information can be found in the EFL agreements which each of them signed as a part of their employment with PaineWebber. Under the terms of the EFL, these restrictions, which would otherwise remain in force if they terminated their employment at PaineWebber, lost their prohibitive force immediately upon repayment of the outstanding portion of the EFL. The Plaintiff admits that all three Defendants have repaid the portions of their respective EFL's which remained outstanding on March 1. As such, Boulos and McQuilling argue, they are not obligated to refrain from soliciting PaineWebber clients or employees, nor are they obligated to refrain from using customer information which they might have obtained at PaineWebber. The Court agrees, and PaineWebber does not contest, that the restrictions of the EFL do not apply to Boulos and McQuilling. These Defendants argue that the terms of the EFL relieve them of any obligation to return customer information or other confidential information or trade secrets to PaineWebber. PaineWebber's

position is that certain statutory and common law restrictions, particularly the North Carolina Trade Secrets Act, apply to Boulos and McQuilling regardless of the duration of the EFL's restrictions. Nothing in the EFL can reasonably be read to eliminate the underlying legal responsibilities of these former employees.

### 2. Protection of PaineWebber Client Information under the Trade Secrets Act.

■ Defendants argue that the information they have taken from Paine-Webber is limited to lists of client names and addresses and that this information is not protected under the North Carolina Trade Secrets Act.[8] N.C. Gen.Stat. § 66–152–157. Regardless of whether or not the information is covered by the Trade Secrets Act, PaineWebber asserts that the manner in which Defendants have taken the information has deprived Paine-Webber's Asheville office of easy access to that information, harming its own ability to contact these clients. Whatever rights Boulos and McQuilling might have to use this information, they do not have the right to take that information in such a way as to deprive PaineWebber of its use. As a general matter, absconding from the PaineWebber office with tangible personal property on which such information is stored (physically or electronically) could be seen as conversion. *See, e.g., Lake Mary Ltd. P'ship v. Johnston*, 145 N.C.App. 525, 531, 551 S.E.2d 546, —— (2001) (defining the elements of

---

**8.** PaineWebber asserts that information other than client names and addresses is missing from its records. The Defendants originally asserted that they had taken no confidential information from PaineWebber. While this statement may be based on the Defendant's interpretation of the term "confidential information," the fact that the Defendant returned a substantial amount of client information to PaineWebber as a result of the TRO leads the Court to conclude that the PaineWebber's assertion is accurate. This order enjoins all of the Defendants from utilizing any information, other than the names and addresses of PaineWebber clients which either of them has obtained as a result of his employment at PaineWebber.

conversion). Insofar as any of the Defendants retains possession of any documents, computer disks, or other material which rightfully belongs to PaineWebber, this injunction will order them to return such material.

■ A separate question remains whether Boulos and McQuilling have the right to use the information they admit they have taken, that is, lists of PaineWebber customers' names and addresses, including lists indicating which owner of a jointly owned account has the right to make decisions concerning that account. Under the North Carolina Trade Secrets Act, a "trade secret" is defined as:

> business or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that:
>
> a. Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and
>
> b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.C. Gen.Stat. § 66–152(3). The Defendants' contention is that names and addresses are "readily ascertainable through independent development . . .". *Id.* Specifically, Boulos and McQuilling cite *Novacare Orthotics & Prosthetics East, Inc. v. Speelman,* 137 N.C.App. 471, 528 S.E.2d 918 (2000), where the North Carolina Court of Appeals stated that "any information used to contact the clients would have been easily accessible to defendant through a local telephone book." *Id.,* at 478, 528 S.E.2d at 922. Furthermore, that Court noted that "the evidence suggests that defendant had been treating these particular clients since his employment with [plain-

tiff]. He had developed a personal relationship with them, and one could expect that they would follow him to a competing business." *Id.* As such, the court held that a list of customer names and addresses is not a "trade secret" under the North Carolina Act. The North Carolina Court of Appeals has recently cited *Novacare Orthotics* in support of this proposition. *Combs & Assoc., Inc. v. Kennedy,* 147 N.C.App. 362, 555 S.E.2d 634, 640 (2001).

PaineWebber argues that, while the individual names and addresses are not trade secrets, the list as a whole is protected, presumably as a "compilation." N.C. Gen. Stat § 66–152(3). PaineWebber attempts to distinguish the instant case from *NovaCare Orthotics* on the grounds that it has consistently taken steps to keep this information secret, a fact which the Defendants do not dispute. Indeed, one basis for the *Novacare Orthotics* decision was that "plaintiff has not come forward with any evidence to show that the company took any special precautions to ensure the confidentiality of its customer information." *NovaCare Orthotics, supra.* Furthermore, PaineWebber argues that because the list of names involved here is substantially larger than that involved in *Novacare Orthotics,* none of the Defendants could reasonably be expected to recall all of them independently.

While PaineWebber's argument is persuasive, the holding of *NovaCare Orthotics* is still the law in North Carolina. This Court, sitting in diversity, is bound to follow North Carolina law as interpreted by the North Carolina Courts. As such, Boulos and McQuilling are free to utilize the information contained in PaineWebber's customer lists. The Court reminds them, however, that they have a continuing duty not to conceal this information from PaineWebber and to return any original or copied versions of this information which

could reasonably be viewed as Paine-Webber's property to the Asheville branch of the company. Furthermore, this Order enjoins all of the Defendants from using any information other than the names and addresses of clients that either of them has obtained about any PaineWebber client as a result of his employment with Paine-Webber.

### D. Public Interest

The public has an interest in ensuring that contracts are enforced. As the Northern District of Illinois held in granting a preliminary injunction in a similar case, "[t]he public has no interest in destroying contracts . . . and encouraging unethical business behavior." *IDS Life Ins. Co.*, 958 F.Supp. at 1282. If, as Defendants contend, brokerage firms and brokers throughout the country routinely ignore the non-compete and non-solicitation clauses of similar contracts, the Court will not, by this ruling, encourage them to do so in the future.

### V. CONCLUSION

Based on the balancing of these four factors under the standard set forth in *Blackwelder* and its progeny, the Court finds that a preliminary injunction against the Defendants is appropriate to preserve the status quo pending arbitration which will decide the merits of this dispute.

### VI. PRELIMINARY INJUNCTION AND ORDER

IT IS, THEREFORE, ORDERED that Plaintiff's motion for a preliminary injunction is **ALLOWED.**

IT IS FURTHER ORDERED that Roger H. Aiken is hereby **RESTRAINED AND ENJOINED** from competing with UBS PaineWebber by engaging for another employer, including but not limited to A.G. Edwards, in any of the duties Aiken was performing for PaineWebber for any client for whom Aiken provided those services on behalf of UBS PaineWebber as of June 9, 2000, or thereafter.

IT IS FURTHER ORDERED that Roger H. Aiken is hereby **RESTRAINED AND ENJOINED** from further solicitation of any such client as described above.

IT IS FURTHER ORDERED that Roger H. Aiken is likewise **RESTRAINED AND ENJOINED** from soliciting any UBS PaineWebber employee to leave his/her employment with that firm. This portion of the injunction is to remain in full force and effect until a final ruling by an arbitration panel, or until September 1, 2002, whichever is earlier. Nothing in this or the previous paragraph shall be construed to restrict the rights of any of those clients or employees to transfer their accounts or employment freely among brokerage firms.

IT IS FURTHER ORDERED that, insofar as any of the Defendants, Roger H. Aiken, Michael S. Boulos, or Patrick G. McQuilling, retain any documents, computer disks, computer drives, or other information storing devices which might reasonably be viewed as the property of UBS PaineWebber, they return any such devices to the custody of UBS PaineWebber **FORTHWITH** and as nearly as possible in the condition in which they were removed from the possession of UBS PaineWebber.

IT IS FURTHER ORDERED that Roger H. Aiken, Michael S. Boulos, and Patrick G. McQuilling are hereby **RESTRAINED AND ENJOINED** from utilizing any and all information, other than a list of names and addresses, which either of them has obtained relating to any UBS PaineWebber client, not limited to the class of client described above, and as a result of his employment at UBS Paine-Webber.

**IT IS FURTHER ORDERED** that Roger H. Aiken shall keep and maintain records of all of his brokerage activities from March 1, 2002, until such time as an arbitration panel makes a final decision in this case, so that the panel will be able easily to determine the conduct of his business.

**IT IS FURTHER ORDERED** that this injunction shall remain in full force and effect until such time as the arbitration panel which decides this case enters its final decision. The arbitration panel shall have the authority to dissolve this injunction as a part of that decision if it so orders.

**IT IS FURTHER ORDERED** that this injunction supersedes the temporary restraining order.